## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: _____-CIV-_____

BMO NESBITT BURNS INC.. BCE INC..
CASCADES INC.. ESARBEE
INVESTMENTS LIMITED. FAIRMONT
HOTEL & RESORTS INC..
FÉDÉRATION DES CAISSES.
DESJARDINS DU QUÉBEC. FONDS DE
SOLIDARITÉ DES TRAVAILLEURS DU
QUÉBEC (F.T.Q.). FREEMARK
HOLDINGS INC.. LOBLAWS INC..
M&S SPORTS INC.. PROVIGO INC..
TELEMEDIA COMMUNICATIONS
INC.. 98362 CANADA INC.. and 114114
CANADA INC..

        Plaintiffs.

v.

JEFFREY H. LORIA. DAVID SAMSON.
ALLAN "BUD" SELIG. OFFICE OF THE
COMMISSIONER OF BASEBALL.
ROBERT DUPUY. BASEBALL EXPOS
GP. INC.. and BASEBALL EXPOS L.P..

        Defendants.

# 02-22061
## CIV-UNGARO-BENAGES

MAGISTRATE JUDGE
B R O W N



## COMPLAINT
### (Jury Trial Demanded)

    Plaintiffs. by and through their undersigned attorneys. for their Complaint in this action. hereby allege as follows:

### INTRODUCTION

    1.    This action is filed by the victims of a conspiracy to eliminate major league baseball in Montreal. Plaintiffs are leading corporate citizens of Canada

who -- before the events that gave rise to this action -- owned close to 100% of the interests in the Montreal Expos Major League Baseball ("MLB") franchise, which has operated in Montreal for more than thirty years.[1]  The defendants – Jeffrey Loria, David Samson, Allan "Bud" Selig, the Office of the Commissioner of Baseball, Robert DuPuy, Baseball Expos GP, Inc., and Baseball Expos L.P. – are the perpetrators of a fraudulent conspiracy and the members of a racketeering enterprise with the object of eliminating major league baseball in Montreal, and removing plaintiffs from standing in the way of that objective.

2.      Jeffrey Loria is an art dealer who became a minority owner (with a 24% interest) and, through an entity under his control, managing general partner of the Montreal Expos in December 1999.  Mr. Loria attained this position as a result of an effort by plaintiffs and various Canadian governmental entities to build a new baseball stadium in downtown Montreal, obtain additional equity financing for the franchise, and secure the future of the Expos in Montreal.  David Samson is one of Mr. Loria's co-conspirators.  He was installed by Mr. Loria as Executive Vice President of the Expos in December 1999.  Mr. Loria and Mr. Samson are collectively referred to herein as the "Loria Defendants."

3.      Contrary to numerous false representations made to plaintiffs by Mr. Loria and Mr. Samson, from the beginning of Mr. Loria's involvement with the Expos, he and his co-conspirators engaged in a scheme that had as its object the

---

[1] Three of the plaintiffs – Esarbee Investments Limited, Loblaws Inc., and 98362 Canada, Inc. (collectively, the "1999 Canadian Partners") – acquired their interests in December 1999.  The remaining plaintiffs (collectively, the "1991 Canadian Partners") acquired their interests in 1991.

destruction of major league baseball in Montreal, so that Mr. Loria and his co-conspirators could justify relocating the franchise to the United States. These actions were implemented by the Loria Defendants immediately after Mr. Loria became a minority owner and an entity under his control became managing general partner of the Expos. The conduct by the Loria Defendants that effectively destroyed the economic viability of baseball in Montreal included removing the Expos from local television, subverting well-developed plans for a new baseball stadium in downtown Montreal, purposefully alienating Expos sponsors and investors, abandoning agreed-upon financial plans for the franchise, and undermining a planned recapitalization of the franchise that would have added new Canadian partners.

4.      At the same time, Allan "Bud" Selig (the Commissioner of Baseball), the Office of the Commissioner of Baseball ("OCB"), and Mr. Selig's principal lieutenant, Robert DuPuy (collectively with Baseball Expos GP, Inc. and Baseball Expos, L.P., the "MLB Commissioner Defendants"), had secretly determined that major league baseball in Montreal should be eliminated. As part of that plan, the MLB Commissioner Defendants and others acting with them made numerous fraudulent misrepresentations to plaintiffs and concealed numerous material facts from plaintiffs, which helped to induce plaintiffs to make an entity controlled by Mr. Loria the managing general partner of the Expos in December 1999.[2] The elimination of the Expos soon became part of a plan of "contraction" that was designed to enrich the owners of the other

---

[2] Baseball Expos L.P. and Baseball Expos GP, Inc. came into existence as part of the conspiracy of the other MLB Commissioner Defendants complained of herein, and joined that conspiracy when they came into existence.

MLB franchises (including Mr. Selig's family interests in the Milwaukee Brewers) and to pressure the Major League Baseball Players Association, the players' union, in upcoming labor negotiations.

5.      Between 1999 and 2001, defendants continued to make numerous false representations and material omissions to plaintiffs as they carried out their plans to eliminate major league baseball in Montreal and remove plaintiffs from standing in the way of that objective. As a result, plaintiffs' ownership interests in the Montreal Expos were drastically diluted to approximately 6% of the franchise, while Mr. Loria took control of approximately 94%. This dilution gave Mr. Loria the power to dispose of the Expos franchise and thus carry out the objective of defendants' conspiracy.

6.      Upon information and belief, although Mr. Loria initially opposed contracting the Expos, because he wanted to remain an owner in major league baseball and relocate the team to the United States, this issue was resolved when the MLB Commissioner Defendants agreed to provide Mr. Loria with another Major League Baseball franchise in the United States to replace the Expos, which would be contracted.

7.      Accordingly, in the Fall of 2001, the Loria Defendants and the MLB Commissioner Defendants engaged in an unprecedented three-cornered "trade" of franchises in which (1) the partnership owning the Expos (of which Mr. Loria now owned 94%) exchanged the Expos for the Florida Marlins MLB franchise, (2) Major League Baseball, through Baseball Expos GP, Inc. and Baseball Expos, L.P., acquired ownership and control of the Expos with the avowed intent to contract it, and (3) John Henry, the former owner of the Marlins, became a principal part of an ownership group that purchased the Boston Red Sox (one of the most valuable franchises in baseball).

8.      All of the defendants thus attained their mutual goal of carrying out a scheme to eliminate major league baseball in Montreal.  The Loria Defendants also attained their goal of owning an MLB franchise in the United States, while the MLB Commissioner Defendants attained their goal of designating the Expos for contraction. Plaintiffs, on the other hand, had their close to 100% ownership in the Expos destroyed by defendants' fraudulent acts.  And, the citizens of Montreal have been placed in imminent danger of having their major league baseball franchise contracted, which will further harm the business and other interests of plaintiffs, who became owners of the Expos because of their loyalty to the citizens of Montreal.

9.      This Complaint alleges claims against defendants under both the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), and applicable state law.

10.     Plaintiffs seek redress for their injuries, including compensatory damages, which are tripled under RICO, and punitive damages in an amount no less than US$100 million.  In addition, this action seeks a constructive trust over the Montreal Expos franchise, and injunctive relief prohibiting the contraction, relocation or sale of that team.

## THE PARTIES

### Plaintiffs

11.     Plaintiff BMO Nesbitt Burns Inc. ("Nesbitt Burns") is a corporation organized under the Canada Business Corporations Act, with its head offices

located at One First Canadian Place, 100 King Street, Toronto, Ontario M5X 1H3.

Nesbitt Burns is one of the leading investment banking firms in Canada.

      12.    Plaintiff BCE Inc. ("BCE") is a corporation organized under the

Canada Business Corporations Act, with its head office located at 1000 de la Gauchetière

Street West, Suite 3700, Montreal, Québec H3B 4Y7. BCE is Canada's largest

communications company.

      13.    Plaintiff Cascades Inc. ("Cascades") is a corporation organized

under the laws of Québec, with its head office at 404 Marie-Victorin Street, Kingsley

Falls, Québec J0A 1B0. Cascades is one of the leading paper-related products companies

in the world.

      14.    Plaintiff Esarbee Investments Limited ("Esarbee") is a corporation

organized under the Canada Business Corporations Act, with its head office located at

1170 Peel Street, Suite 800, Montreal Québec H3B 4P2. Esarbee is the successor of

Bronterra International Corporation ("Bronterra"). Esarbee is led by Stephen R.

Bronfman, whose father, Charles R. Bronfman, founded the Montreal Expos in 1969 and

was the principal owner of the franchise until 1991.

      15.    Plaintiff Fairmont Hotel & Resorts Inc. ("Fairmont") is a

corporation organized under the Canada Business Corporations Act, with its head office

located at 100 Wellington Street West, Suite 1600, Toronto-Dominion Centre, Toronto,

Ontario M5K 1B7. Fairmont is one of the leading hotel and resort companies in the

world.

      16.    Plaintiff Fédération des Caisses Desjardins du Québec ("Caisses")

is an entity organized under the laws of Québec, with its head office located at 1

Complexe Desjardins, Succursale Desjardins, 40th Floor, Montreal, Québec H5B 1B2. Caisses is one of the leading financial institutions in Canada.

17.     Plaintiff Fonds de solidarité des travailleurs du Québec (F.T.Q.) ("FTQ") is a labor-sponsored development capital investment fund created by the Québec Federation of Labour (QFL), with its head office located at 8717 Berri Street, Montreal, Québec H2M 2T9.  FTQ has more than 530,000 shareholders, and encourages workers to save for their retirement and to participate in economic development by subscribing for F.T.Q. shares.

18.     Plaintiff Freemark Holdings Inc. ("Freemark") is a corporation organized under the Canada Business Corporations Act, with its head office located at 7077 Park Avenue, Suite 503, Montreal, Québec H3M 1X7.  Freemark is an investment company that, among other things, operates the franchise for the sale of "Guess" clothing in Canada.

19.     Plaintiff Loblaws Inc. ("Loblaws") is a corporation organized under the laws of Ontario, with its head office located at 22 St. Clair Avenue East, Suite 1500, Toronto, Ontario M4T 2S8.  Loblaws operates the leading grocery chain in Canada.

20.     Plaintiff M&S Sports Inc. ("M&S") is a corporation organized under the laws of Ontario, with its head office located at 481 University Avenue, Suite 303, Toronto, Ontario M5G 2E9.  M&S is a holding company associated with McClelland & Stewart Ltd., the largest and most prestigious Canadian book publishing company.

21.     Plaintiff Provigo Inc. ("Provigo") is a corporation organized under the laws of Québec, with its head offices located at 2000 McGill College Avenue, Suite 1501, Montreal, Québec H3A 3H3. Provigo operates one of the leading grocery chains in Québec, and is owned by Loblaws.

22.     Plaintiff Telemedia Communications Inc. ("Telemedia") is a corporation organized under the Canada Business Corporations Act, with its head offices located at 1411 Peel Street, 6th Floor, Montreal, Québec H3A 1S5. Telemedia is a subsidiary of Telemedia Corporation, a private holding company with investments in the telecommunications, communications, and media industries.

23.     Plaintiff 98362 Canada Inc. ("98362 Canada") is a corporation organized under the laws of Canada, with its head offices located at 530 Bériault Street, Longueuil, Québec J4G 1S8. 98362 Canada is an affiliate of Pharmacie Jean Coutu (PJC) Inc., which is one of the leading pharmacies in Québec and the northern United States.

24.     Plaintiff 114114 Canada Inc. ("114114 Canada") is a corporation organized under the laws of Canada, with its head offices located at 50 de Lauzon Street, Boucherville, Québec J4B 1E6. 114114 Canada is an affiliate of San Francisco, one of the leading retailers in Canada.

**Defendants**

25.     Defendant Jeffrey Loria, through one or more entities under his control, is currently the principal owner (owning approximately 94%) of the Florida Marlins Major League Baseball franchise, as a result of the illegal conduct that is the subject of this action. Previously, beginning on December 9, 1999, through one or more

entities under his control, Mr. Loria became a minority owner (owning approximately 24%) and the managing general partner of the Montreal Expos Major League Baseball franchise.  Upon information and belief, before becoming involved with the Expos, Mr. Loria's principal business was acting as an art dealer.

26.    Defendant David Samson is currently an executive with the Florida Marlins Major League Baseball Franchise.  Previously, beginning on December 9, 1999, Mr. Samson was installed by Jeffrey Loria as Executive Vice President of the Montreal Expos Major League Baseball franchise.  Upon information and belief, Mr. Samson is Mr. Loria's stepson.

27.    Defendant Allan "Bud" Selig is the Commissioner of Baseball, and was formerly the principal owner of the Milwaukee Brewers Major League Baseball franchise.  Upon information and belief, the current principal owner of the Brewers franchise is Mr. Selig's daughter.

28.    Defendant Office of the Commissioner of Baseball ("OCB") is an office created pursuant to the Major League Agreement entered into by the member clubs of Major League Baseball, and is located at 245 Park Avenue, New York, New York. Upon information and belief, the OCB has the power to act for and bind Major League Baseball in business matters centralized in the League.

29.    Defendant Robert DuPuy is currently the President and Chief Operating Officer of Major League Baseball, having succeeded Paul Beeston in that position on or about March 7, 2002.  Prior to then, Mr. DuPuy was Executive Vice President, Administration, and Chief Legal Officer of the OCB, and acted on behalf of the OCB in that capacity.

30.     Defendant Baseball Expos L.P. is, upon information and belief, the current owner of the Montreal Expos Major League Baseball franchise, and is organized under the laws of Delaware.  It is owned by the other twenty-nine MLB franchises, but is under the control of the OCB.

31.     Defendant Baseball Expos GP, Inc. is, upon information and belief, the general partner of Baseball Expos L.P., and is organized under the laws of Delaware, with its offices at 245 Park Avenue, New York, New York.  It is under the control of the OCB.

### JURISDICTION & VENUE

32.     The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331.

33.     This action arises under the laws of the United States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

34.     The Court has supplemental jurisdiction over the state law claims for relief pursuant to 28 U.S.C. § 1367(a), since these claims arise from a common nucleus of operative facts and are so intertwined with the federal claims for relief as to make an exercise of the Court's jurisdiction appropriate.

35.     Venue is proper under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b).

36.     The Loria Defendants conduct business in this District through their operation of the Florida Marlins Major League Baseball franchise.  The Loria Defendants, upon information and belief, also maintain residences in the State of Florida.

37.     The MLB Commissioner Defendants conduct business in this District, including through their management of television broadcasts, merchandise sales, and major league baseball games played in this District by the Montreal Expos, the Florida Marlins, and other MLB teams.

38.     The ill-gotten gains of the Loria Defendants include the Florida Marlins Major League Baseball franchise, which is located in this District.

39.     The conduct of defendants alleged in this Complaint took place, in material part, in this District, including through fraudulent misrepresentations made by the Loria Defendants in this District.

## FACTUAL ALLEGATIONS

### The History Of The Expos And
### The Plan To Revitalize The Franchise

40.     The Montreal Expos were founded in 1969 by Charles R. Bronfman – a member of the Bronfman family, who were for many years the principal owners of Seagram, one of the most successful companies in Canada.

41.     Between 1969 and 1991, despite being located in a relatively small market, the Expos had a number of successful seasons, winning the National League East title in 1981, producing All-Star players such as Gary Carter, Andre Dawson, and Tim Raines, and out-drawing "big market" teams like the New York Yankees in several years (for example, attendance was more than 2.3 million in 1983).

42.     In 1991, Mr. Bronfman sold the Montreal Expos franchise to a limited partnership comprised of leading corporate citizens of Montreal. The 1991 Canadian Partners, plaintiffs herein, were the principal members of that partnership. As part of the 1991 transaction, Claude Brochu became a minority owner and managing general partner of the Expos.

43.     Between 1991 and 1994, the Expos organization continued to produce All-Star players, including Pedro Martinez, Larry Walker, John Wettland, and Moises Alou. The team performed well on the field, having a record of 74-40 during the strike-shortened 1994 season, the best in Major League Baseball that year. However, the economic fortunes of the Expos at the gate were seriously constrained by the fact that the team played its home games at Olympic Stadium -- an indoor stadium designed for the Montreal Summer Olympics in 1976 -- which is not an appealing venue for baseball.

44.     After the strike-shortened 1994 season, Claude Brochu, as managing general partner of the Expos, decided that the franchise did not have sufficient financial resources to re-sign its best players, and proceeded to let many of those players leave the team either through trades or free agency. This decision -- combined with the absence of any efforts by Mr. Brochu to improve the team through trades or free agency -- led to further financial problems for the franchise, as fans became disillusioned with this management philosophy.

45.     In 1997, the ownership of the Expos, including the 1991 Canadian Partners, concluded that the only way the team could afford to be competitive and revitalize the franchise in Montreal was to build a new stadium. A campaign was thus begun to build a new outdoor baseball park in downtown Montreal, which would also be

a great benefit for the city.  As part of that campaign, many of the plaintiffs herein made strenuous efforts to develop public and private support for the new stadium, and developed a plan for a public and private partnership that was unprecedented in Canada for the support of a professional sports team.

46.     However, by the end of 1998, the 1991 Canadian Partners learned that Mr. Brochu no longer had the commitment to carry out the stadium effort and attract the private capital that was necessary to make the team economically viable in Montreal. Accordingly, a new plan was developed in which the 1991 Canadian Partners would agree to have their ownership interests in the Expos diluted, in exchange for which CA$150 million in new equity would be contributed to the franchise, with CA$75 million to come from new Canadian investors and CA$75 million to come from U.S. investors and/or a new managing general partner, who would take over for Mr. Brochu.

47.     By the Fall of 1999, the plan for building a new stadium was supported by, among other things:  (1) the acquisition of a favorable option on prime real estate in downtown Montreal on which the stadium would be built; (2) a naming rights agreement entered into in May 1998 by Labatt breweries under which the Expos would be paid CA$40 million over 20 years in exchange for the naming of the new stadium by Labatt; (3) an agreement by the Québec Government to fund out of its budget approximately CA$8 million annually for 35 years to satisfy interest obligations on bonds of CA$100 million that would be used to help finance the stadium; (4) an agreement from governmental authorities to provide approximately CA$12 million in annual relief from property and business taxes that would otherwise apply in the new ballpark; and (5) the

negotiation of construction contracts on favorable terms with reputable and experienced firms so that the expense of building the new ballpark would be minimized.

48.     The express purpose of the plan to revitalize the Expos – which was made known to the defendants – was that the team would build a new downtown stadium and remain in Montreal.  Indeed, the Expos sought and obtained the support of the MLB Commissioner Defendants for a document entitled "Preliminary Confidential Information Memorandum," "Draft 18" ("CIM-18"), which included detailed descriptions of the franchise's plans to build a new downtown stadium and remain in Montreal.

49.     Upon information and belief, at the time the MLB Commissioner Defendants commented on and supported CIM-18, they knew that their secret intention was to eliminate major league baseball in Montreal.  Despite this fact, during 1999, the MLB Commissioner Defendants made false representations and material omissions, including by international telephone conversations and international mail, in which they indicated to plaintiffs and their representatives that they would support the plans eventually described in CIM-18 in order to enable the Expos to remain in Montreal. Examples of written communications containing such misrepresentations and omissions include letters from Defendant DuPuy to one of the plaintiffs, dated February 4, 1999 and February 25, 1999.

## Defendants' Fraudulent Actions To Eliminate The Expos From Montreal

50.     By February 1999, the 1991 Canadian Partners entered into discussions with Jeffrey Loria to become the principal new investor and managing

general partner of the Expos. Specifically, both Mr. Loria and Mr. Samson were asked to support the plans that ultimately were set forth in CIM-18, with Mr. Loria agreeing to become the managing general partner (through an entity under his control) and to provide, through himself and other U.S. investors, CA$75 million in new equity for the franchise.

51. During these negotiations with Mr. Loria and Mr. Samson, plaintiffs repeatedly advised them that the plan was that the 1991 Canadian Partners would not have to contribute additional cash to the Expos franchise for at least several years, and that additional capital was to be provided through the CA$150 million in new equity that was to be raised -- CA$75 million from Mr. Loria and the other new U.S. investors he would provide, and CA$75 million from new Canadian partners. Plaintiffs also advised Mr. Loria and Mr. Samson that the plan was for the Expos to build a new stadium, as set forth in CIM-18, and remain in Montreal.

52. During the negotiations in 1999, including in several telephone communications between the United States and Canada, the Loria Defendants indicated to plaintiffs that: (1) they did not intend to move the Expos from Montreal; (2) they were supportive of the plan to build a new stadium to secure the future of the franchise in Montreal; and (3) they were in agreement with the fundamental business strategies and plans for the team that were eventually set forth in CIM-18, and that Mr. Loria would follow those business strategies and plans as managing general partner of the franchise.

53. Plaintiffs reasonably relied upon these representations by the Loria Defendants. However, those representations were false. Specifically, upon information and belief, the Loria Defendants intended from the very beginning not to keep the Expos

in Montreal, and instead to destroy the ability of the Expos to survive in Montreal in order to relocate the team to the United States. They also intended to use their misrepresentations – including those by international wire and mail – to induce the plaintiffs to give Mr. Loria the power to control the Expos and to dilute the ownership interests of plaintiffs.

54.     But for the fraudulent representations and material omissions made by the Loria Defendants and their representatives – as further supported by the false representations of the MLB Commissioner Defendants that they too would support the Expos remaining in Montreal -- plaintiffs would not have entered into the sale and partnership agreements with the entities controlled by Mr. Loria.

55.     Those representations by the defendants were false when made, and were made with malice by the defendants. Plaintiff reasonably relied upon those representations, and those representations had the effect of fraudulently inducing plaintiffs to enter into the transactions with the entities controlled by Mr. Loria that gave him control over the Expos.

56.     In the Fall of 1999, Mr. DuPuy and other representatives of Mr. Selig and the OCB communicated to representatives of plaintiffs that Major League Baseball could not wait for the owners of the Expos to finalize all aspects of the recapitalization of the franchise discussed above in Paragraph 46 and that it was essential to put Mr. Loria's entity in place as the new managing general partner of the Expos before the end of the year. Further, Mr. DuPuy and other representatives of Mr. Selig and the OCB communicated to plaintiffs that Major League Baseball would not approve the transaction being contemplated unless the partnership agreements included provisions

which would give Mr. Loria the power to issue mandatory cash calls on the limited partners. At the time of these communications, the MLB Commissioner Defendants continued to misrepresent that they supported the plans for keeping the Expos in Montreal eventually set forth in CIM-18. These representations and material omissions were made, in part, through international telephone calls and/or mails.

57.     Under extreme pressure from the MLB Commissioner Defendants to close the transaction, plaintiffs agreed that the recapitalization would be accomplished in two steps, with Mr. Loria purchasing his minority interest and an entity under his control becoming managing general partner first, and the remainder of the recapitalization from the new Canadian Partners and Mr. Loria occurring thereafter.

58.     At the insistence of the MLB Commissioner Defendants, plaintiffs also agreed to include in the first step a mandatory capital call procedure that would be under the direction of an entity controlled by Mr. Loria. However, the Loria Defendants represented to plaintiffs and their representatives that no such capital calls would be necessary for at least several years in view of the recapitalization that was going to take place with the new investors.

59.     Accordingly, on December 9, 1999, plaintiffs and Mr. Loria executed documentation through which a new limited partnership was formed to own and operate the Montreal Expos franchise, with an entity owned by Mr. Loria acquiring approximately 24% of the franchise for CA$18 million (approximately US$12 million), a price that was subsidized by plaintiffs. In that same transaction, Loblaws, 98362 Canada (together with Pharmacie Jean Coutu (PJC) Inc.), and Bronterra (the predecessor of Esarbee) each contributed CA$1 million in capital to acquire their individual interests,

with the understanding that they would be investing additional monies as part of the second step of the recapitalization. These agreements -- fraudulently induced by the Loria Defendants and the MLB Commissioner Defendants -- gave Mr. Loria the power to destroy the Expos' ability to attract new investors and remain in Montreal, and the power to make immediate capital calls that could be used to dilute the ownership interests of the plaintiffs in favor of Mr. Loria.

60. Upon information and belief, when Major League Baseball approved the above-described transactions between Mr. Loria and plaintiffs on December 9, 1999, Mr. Selig, Mr. DuPuy and the OCB had already determined that their plan was to eliminate major league baseball in Montreal. Neither Mr. Selig, Mr. DuPuy nor the OCB informed plaintiffs of these material facts, and plaintiffs reasonably relied upon those misrepresentations and omissions in deciding to proceed with the transactions with Mr. Loria.

61. Immediately after Mr. Loria became a minority owner and an entity under his control became the managing general partner of the Expos, he, Mr. Samson and others took action to begin effectuating their plan to destroy the viability of major league baseball in Montreal, with the objective of moving the franchise to the United States.

62. On January 17, 2000, at the first meeting of the new Expos partnership, and only five weeks after the transactions with Mr. Loria closed: (1) Mr. Samson (who had been appointed Executive Vice President of the Expos by Mr. Loria over the objections of plaintiffs) advised the other partners that the Expos games in the upcoming season likely would be unavailable on either local television or radio in

Montreal, because Mr. Loria would not accept the terms upon which such broadcasts had previously been conducted; (2) Mr. Joel Mael, Mr. Loria's financial representative, stated that a new capital call on the current partners would have to be immediately commenced, notwithstanding the previous representations by the Loria Defendants that this would not be necessary for at least several years because of the planned second stage recapitalization; and (3) Mr. Samson indicated that complimentary tickets would no longer be made available to sponsors (even though excess tickets were available and the support of sponsors was essential to the team's success and continued viability in Montreal).

      63.    At the same time, the Loria Defendants continued to falsely represent that they were proceeding with the new stadium plans in good faith, that they would follow the plans set forth in CIM-18, and that they intended to keep the team in Montreal.  Indeed, at the January 17 meeting, the Chief Financial Officer of the Expos stated that the expenses forecast for the 2000 season would be those referenced in the partnership agreement signed on December 9, 1999.  Following the January 17 meeting, the Loria Defendants continued to represent to plaintiffs, including by international telephone calls, that they were working in good faith on the new stadium and the agreed upon plan to keep the team in Montreal.  Those representations were false, and were made with the specific intent to deceive plaintiffs.

      64.    Then, on March 17, 2000, in Palm Beach Gardens, Florida, at the second meeting of the Expos partners:  (1) Mr. Loria reiterated that the games in the upcoming season likely would be unavailable on either local television or radio in Montreal; (2) Mr. Mael reiterated that a capital call on the current limited partners would

occur, notwithstanding the pendency of the recapitalization effort; (3) Mr. Loria and Mr. Mael distributed new financial projections that were completely at variance with the tenets of CIM-18, effectively destroying the recapitalization effort and making the addition of any further capital from either the 1999 Canadian Partners or new Canadian investors impossible; and (4) Mr. Loria stated that the Canadian investors would need to fund the equity needed to construct a new stadium in downtown Montreal "up-front" before he would disclose to the investors his plans for operating the franchise based upon the new financial projections he distributed (a situation in which no rational person could invest). At the same time, the Loria Defendants continued to omit and conceal the material fact that their intention was to move the Expos out of Montreal rather than build a new stadium.

65.    Thereafter, the Loria Defendants took further steps to destroy the future of the Expos franchise in Montreal. For example, at the direction of Mr. Loria and Mr. Samson, the Expos abandoned local television and English-language radio coverage for the 2000 season, and Expos games were broadcast on French-language radio in Montreal only because of the efforts of several of the plaintiffs. The Loria Defendants also took positions that were designed to poison the Expos' relationship with Canadian governmental authorities. The actions of the Loria Defendants killed the efforts for a new stadium, alienated fans, and effectively destroyed the Expos' future in Montreal.

**The Sham "Buy-Out" Of
Plaintiffs' Ownership Interests**

66.    As a result of the actions of the Loria Defendants, in May 2000, plaintiffs offered to buy-out Mr. Loria at the same price he had purchased his interest,

and to take back control of the Expos.  Mr. Loria adamantly refused and said he would never sell his interest.  Instead, Mr. Loria indicated that he would be willing to buy out plaintiffs for the approximate amount of their original investment.

67.     With the future of the Expos in Montreal severely damaged by the actions of the Loria Defendants, and with the looming threat of dilution through new capital calls, plaintiffs concluded that they had little choice but to sell their interests in the franchise to Mr. Loria.  Accordingly, during the Summer and Fall of 2000, plaintiffs negotiated with Mr. Loria to effectuate a sale to him of their interests in the Expos.  The MLB Commissioner Defendants were fully informed of those negotiations and were provided with copies of the documentation being exchanged by the parties.

68.     Upon information and belief, during this period, Mr. Loria was discussing with the MLB Commissioner Defendants his plan to move the Expos to the United States.  The Loria Defendants and the MLB Commissioner Defendants did not disclose this material fact to plaintiffs.

69.     An agreement on all material terms for the buyout of plaintiffs by Mr. Loria was reached by the Fall of 2000, but the closing was repeatedly delayed by the Loria Defendants and their representatives.  At various times, the Loria Defendants and their representatives blamed the MLB Commissioner Defendants for the delay.  At other times, the Loria Defendants and their representatives raised false obstacles to closing the transaction.  Upon information and belief, during this period, and unbeknownst to plaintiffs, Mr. Loria and his representatives had told the MLB Commissioner Defendants that Mr. Loria would not close the transaction with plaintiffs unless Major League Baseball would approve their relocating the Expos to the United States.  Both the Loria

Defendants and the MLB Defendants deliberately concealed this material fact from plaintiffs during the Fall of 2000.

70.     At the same time, Mr. DuPuy and other representatives of Mr. Selig and the OCB repeatedly assured plaintiffs that Major League Baseball would approve the proposed buyout even though they had no intention of doing so.  Upon information and belief, the MLB Commissioner Defendants made these fraudulent statements and omissions of material fact in order to hide their plan to contract the Expos franchise, and to induce plaintiffs not to take any action that might impede that plan.

71.     On December 15, 2000, one of the plaintiffs received a copy of a letter from Robert DuPuy (addressed to Mr. Loria but sent by facsimile from New York to one of the plaintiffs in Canada), stating that Major League Baseball was not prepared to approve the proposed sale of plaintiffs' interests to Mr. Loria, because, among other things, the "impending labor negotiations have given us a measure of concern with regard to the proposed transaction," and further stating that the transaction would not be considered until after an MLB owners meeting scheduled to occur in January 2001.  This letter – a copy of which may have been sent to one of the plaintiffs inadvertently – came as a total shock to plaintiffs because they had repeatedly been assured by the MLB Commissioner Defendants that plaintiffs' buyout by Mr. Loria would be approved.  As this letter made clear, those representations were false.

72.     On December 20, 2000, several representatives of plaintiffs located in Canada had a telephone conference call with Mr. DuPuy, who was located in New York.  In that telephone conference, Mr. DuPuy falsely represented to plaintiffs that MLB approval of the transaction between plaintiffs and Mr. Loria "is not going to be

withheld." Upon information and belief, Mr. DuPuy's representations in the aforesaid call were made at the direction of Mr. Selig and the OCB. Those representations were false and were made with the specific intention to mislead plaintiffs and to conceal from them the fact that the MLB Commissioner Defendants had already decided to eliminate major league baseball in Montreal.

73.     At the MLB owners' meeting in January 2001, Mr. Loria threatened to sue Major League Baseball if it did not permit him to relocate the Expos franchise to the United States. These statements were made in furtherance of the Loria Defendants' plan to eliminate major league baseball in Montreal.

74.     Throughout February and March of 2001, representatives of plaintiffs and representatives of Mr. Selig and the OCB had numerous international telephone communications in which false representations were made to plaintiffs by Mr. DuPuy and other OCB representatives in furtherance of the MLB Commissioner Defendants' plan to eliminate major league baseball in Montreal.

75.     For example, on February 15, 2001, several representatives of plaintiffs had a telephone conference with Paul Beeston, then-President and Chief Operating Officer of MLB. In that international telephone conference between Montreal and New York, Mr. Beeston advised plaintiffs' representatives that Major League Baseball would endeavor to buy-out the plaintiffs in lieu of Mr. Loria doing so. Those representations, made on behalf of the MLB Commissioner Defendants, were false (although Mr. Beeston himself may have been misled by the MLB Commissioner Defendants when he made these communications on their behalf).

76.     In reliance upon these representations, and at the urging of the MLB Commissioner Defendants and their representatives, plaintiffs did not take immediate legal action against Mr. Loria at the time.  Instead, at the suggestion of representatives of the OCB, plaintiffs sent a written proposal to the OCB in March 2001, pursuant to which plaintiffs would have their interests in the Expos acquired by Major League Baseball.

77.     In reality, the MLB Commissioner Defendants had no intention of having MLB acquire plaintiffs' ownership interests in the Montreal Expos.  Instead, the MLB Commissioner Defendants proceeded to agree with the Loria Defendants on a plan in which a way was found to provide Mr. Loria with ownership of another MLB franchise in the United States, with the Expos becoming a victim of contraction.  The MLB Commissioner Defendants thus worked secretly with Mr. Loria, Mr. Samson and their representatives to enable them to dilute plaintiffs' ownership of the Expos to a negligible level, and to make false statements to plaintiffs and conceal material facts from them to accomplish that goal.

**The Loria Defendants Take Over The Expos**
**And Trade The Franchise For The Florida Marlins**

78.     Between February 9 and August 27, 2001, the Loria Defendants effectuated a series of capital calls on plaintiffs that were represented to be for legitimate business purposes of the Expos, but in fact were made for the purpose of diluting the ownership interests of plaintiffs so that the Loria Defendants could take over the Expos, eliminate major league baseball in Montreal, and obtain another MLB team in the United States.  The MLB Commissioner Defendants helped induce the plaintiffs to allow their

interests to be so diluted, by concealing defendants' secret plan to provide Mr. Loria with another MLB franchise in exchange for the Expos.

79.    For example, during the Summer of 2001, a representative of plaintiffs had an international telephone conversation with Mr. Beeston, in which Mr. Beeston assured plaintiffs' representative that Mr. Loria would not receive an economic windfall from the MLB Commissioner Defendants' intention to contract the Expos (which had, by then, become known to plaintiffs). Those statements -- made on behalf of the MLB Commissioner Defendants -- were false (although Mr. Beeston himself may have been misled by the MLB Commissioner Defendants when he made these communications on their behalf).

80.    Plaintiffs reasonably relied upon these false statements and material omissions of the MLB Commissioner Defendants and the Loria Defendants in deciding not to participate in the capital calls. As a result, by the Fall of 2001, plaintiffs' ownership interests in the Expos had been diluted from approximately 74% (in January of 2000) to approximately 6%, with Mr. Loria becoming the owner, through his entities, of approximately 94% of the franchise. As a result of his fraudulent conduct and that of the other defendants, Mr. Loria was able to achieve near total ownership of the Expos without paying any compensation to plaintiffs.

81.    With the future of the Expos in Montreal destroyed and the plaintiffs diluted to an insignificant ownership share, defendants proceeded with the next step of their conspiracy. In December 2001, it was publicly announced that the Expos and Marlins franchises would be swapped, with entities controlled by Mr. Loria gaining ownership of the Marlins, MLB gaining ownership of the Expos, and the Expos slated for

contraction.  John Henry, the owner of the Marlins, was paid by MLB for his franchise,

freeing him to become an owner of the Boston Red Sox.

82.     On February 22, 2002, Mr. Loria formally advised plaintiffs by

correspondence of the completion of the transaction in which the Expos were exchanged

for the Marlins.  That correspondence, which was sent from the United States to Canada,

included false statements and omissions of material facts, in furtherance of defendants'

fraudulent scheme.  For example, the letter fraudulently misrepresented that the Loria

Defendants and Major League Baseball did not decide until after the 2001 MLB season to

eliminate the Expos from Montreal.

83.     Contrary to the representations made to plaintiffs by the MLB

Commissioner Defendants, Mr. Loria has received a financial windfall for his ownership

of the Expos.  His new ownership interest in the Marlins is worth far more than the

monies he paid to acquire his 94% interest in the Expos.

84.     The only reason the contraction of the Expos did not occur prior to

the 2002 Major League Baseball season was because of legal action taken by the Major

League Baseball Players Association and governmental entities in Minnesota (the

geographic location of the other MLB franchise slated for contraction).  Upon

information and belief, MLB has since reached a settlement with the Minnesota entities

that precludes contraction of the Minnesota Twins MLB franchise through the 2003 MLB

season.  However, the MLB Commissioner Defendants have stated that it is still their

intention to contract the Expos next year, with another as yet unidentified MLB franchise.

85.     The current owners and operators of the Expos -- Baseball Expos

GP, Inc. and Baseball Expos L.P. -- which are controlled by defendant Selig and the

OCB, agreed to the overall objective of defendants' enterprise when those entities were created. They have been unjustly enriched as a result of the conduct that is the subject of this action.

86.     As a result of defendants' fraudulent enterprise, plaintiffs are left with an approximately 6% ownership interest in the Florida Marlins – a team they never intended to own. Plaintiffs' investment in the Expos over the past ten years – a franchise worth more than a hundred million dollars (U.S.) -- has been wiped out and plaintiffs' plan to revitalize major league baseball in Montreal has been gutted. All of this occurred as a direct result of defendants' frauds and RICO conspiracy, which were designed to destroy plaintiffs' investment in the Expos and major league baseball in Montreal.

## RICO ALLEGATIONS

87.     Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c).

88.     At all times relevant hereto, plaintiffs and the defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

89.     The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which plaintiffs collectively refer to as the "Expos Elimination Enterprise": (1) Jeffrey Loria; (2) David Samson; (3) Allan "Bud" Selig; (4) Robert DuPuy; (5) the OCB; (6) Baseball Expos GP, Inc.; and (7) Baseball Expos L.P.

90.     The Expos Elimination Enterprise is an ongoing enterprise, which engages in, and whose activities affect, interstate and international commerce. The

Expos franchise continues to operate in Montreal, and there is a continuing threat of criminal activity until the Expos Elimination Enterprise has accomplished its goal of eliminating major league baseball in Montreal.

91.    While the defendants participate in the enterprise and are a part of it, the defendants also have an existence separate and distinct from the enterprise.

92.    Defendants conduct or participate in the conduct of the Expos Elimination Enterprise's affairs through a pattern of racketeering activity.

93.    Defendants' participation in the Expos Elimination Enterprise is necessary for the successful operation of defendants' scheme.

94.    The enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the defendants engage.  The Expos Elimination Enterprise operated and operates with two related structures, one of which is headed by Allan "Bud" Selig (with Mr. DuPuy and others as his subordinates), and the other of which is headed by Mr. Loria (with Mr. Samson and others as his subordinates). The structure operated by Mr. Loria was and is subordinate to Mr. Selig, who acted on behalf of the OCB.

**Predicate Acts**

95.    The numerous predicate acts of mail and wire fraud described herein are part of the fraudulent schemes by defendants designed to eliminate major league baseball in Montreal.

96.    Section 1961(1) of RICO provides that "racketeering activity" is any act indictable under any of the provisions of Title 18, United States Code § 1341

(relating to mail fraud), §1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud).

97.    In carrying out the overt acts and fraudulent schemes described above, the defendants engaged in, among other things, conduct in violation of federal laws, including 18 U.S.C. §§ 1341, 1343, and 1346, 18 U.S.C. § 1952(a), and 18 U.S.C. § 1961 et seq.

98.    Examples of the predicate acts committed by defendants pursuant to their scheme to eliminate major league baseball in Montreal include those set forth above in paragraphs 49, 52-54, 56, 58, 60, 68-72, 74-79, and 82. Upon information and belief, there have been numerous other predicate acts by defendants that are presently unknown to plaintiffs.

**Mail And Wire Fraud**

99.    For the purpose of executing and/or attempting to execute their scheme to defraud plaintiffs by means of false pretenses, representations or promises, the defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service, and received matter and things therefrom, including but not limited to agreements, correspondence, faxes, and other materials.

100.    For the purpose of executing and/or attempting to execute their scheme to defraud plaintiffs by means of false pretenses, representations or promises, the defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom, including but not limited to agreements, correspondence, faxes, and other materials.

101.     In those matters and things sent or delivered by the Postal Service, by wire, and through other interstate and international electronic media, defendants falsely and fraudulently misrepresented and/or fraudulently concealed material facts from plaintiffs, in violation of 18 U.S.C. §§ 1341 and 1343, including but not limited to those acts set forth above in Paragraphs 49, 52-54, 56, 58, 60, 68-72, 74-79, and 82.

102.     As a result, plaintiffs have been injured in their business or property by the defendants' overt acts and racketeering activities.

**Pattern of Racketeering Activity**

103.     As set forth herein, the defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described herein, within the past ten years.  Defendants have committed multiple acts of racketeering activity within such period.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including plaintiffs.

104.     The multiple acts of racketeering activity committed and/or conspired to commit by defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

## COUNT I

### RICO -- 18 U.S.C. § 1962(c)
### (against all defendants)

105.   The plaintiffs incorporate and reallege the previous paragraphs as if fully set forth herein.

106.   Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

107.   Through the patterns of racketeering activities outlined above, the defendants have conducted and participated in the affairs of the Expos Elimination Enterprise.

108.   As a direct and proximate result of defendants' illegal conduct in violation of 18 U.S.C. § 1962(c), plaintiffs have been injured in their business or property, including, but not limited, by:

(a)   the theft and lost value of plaintiffs' ownership interests in the Montreal Expos MLB franchise;

(b)   the lost profits plaintiffs would have achieved but for defendants' unlawful conduct;

(c)   the damage to plaintiffs' businesses that has occurred as a result of the pending contraction of the Expos; and

(d)     the harm to plaintiffs' goodwill that has occurred as a result of the

pending contraction of the Expos.

109.    With respect to their violations of 18 U.S.C. § 1962(c), defendants

have acted at all times with malice toward plaintiffs, and with the specific intent to

commit the predicate acts alleged herein and to participate in the Expos Elimination

Enterprise.

**COUNT II**

**RICO -- 18 U.S.C. 1962(d)**
**(against all defendants)**

110.    Plaintiffs incorporate and reallege the previous paragraphs as if

fully set out herein.

111.    This claim seeks relief for the defendants' activities described

herein for violations of 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. §

1962(c).

112.    Section 1962(d) of RICO provides that "[i]t shall be unlawful for

any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this

section."

113.    Absent defendants' conspiracy and joint efforts, defendants'

fraudulent enterprise would not be successful.

114.    Defendants have violated § 1962(d) by conspiring to violate 18

U.S.C. § 1962(c).  The object of this conspiracy has been and is to eliminate major league

baseball in Montreal, and to conduct and/or participate in, directly or indirectly, the

conduct of the affairs of the § 1962(c) enterprise described above through a pattern of racketeering activity.

115.    Defendants and their agents have been joined in their conspiracies to violate 18 U.S.C. § 1962(c) by various third parties not named as defendants herein.

116.    Defendants agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), and agreed to commit overt acts and predicate acts, as alleged in this Complaint, to effectuate that conspiracy. Defendants were aware that their acts were part of an overall pattern of racketeering activity.

117.    As a direct and proximate result of the defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), plaintiffs have been and are continuing to be injured in their business or property as described above in Paragraph 108.

## COUNT III

### Fraud
### (against defendants Loria, Samson, Selig, DuPuy and the OCB)

118.    Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

119.    As set forth in Paragraphs 52-53, 58, 62-66, 68-69, 77-78, and 82 above, the Loria Defendants and/or their representatives knowingly and fraudulently made numerous false statements to plaintiffs and/or their representatives, and knowingly and fraudulently concealed numerous material facts from plaintiffs and their

representatives, concerning various events related to the Montreal Expos and plaintiffs'
ownership interests therein, including but not limited to the following:

(a)      representations by the Loria Defendants and/or their
representatives during the period from at least February 1999
through December 9, 1999 that Mr. Loria intended to keep the
Expos in Montreal, build a new stadium in Montreal, and follow
the plans eventually set forth in CIM-18;

(b)      representations by the Loria Defendants and/or their
representatives during the period from December 9, 1999 through
May 2000 that Mr. Loria intended to keep the Expos in Montreal,
build a new stadium in Montreal, and follow the plans set forth in
CIM-18;

(c)      representations by the Loria Defendants and/or their
representatives during the period from May to December 2000 that
Mr. Loria would purchase the ownership interests of plaintiffs and
keep the team in Montreal;

(d)      representations by the Loria Defendants and/or their
representatives during the period from the Spring of 1999 through
December 2000 in which they intentionally misrepresented and
concealed the material fact that Mr. Loria intended to relocate the
Expos to the United States;

(e)      representations by the Loria Defendants and/or their
representatives during 2001 in which they intentionally

misrepresented and concealed the material fact that the MLB
Commissioner Defendants had agreed to acquire the Expos
franchise from Mr. Loria in exchange for another MLB franchise
in the United States; and

(f)     representations by the Loria Defendants and/or their
representatives during 2001 in which they intentionally
misrepresented and concealed material facts concerning the terms
under which Mr. Loria would be paid off by the MLB
Commissioner Defendants in exchange for transferring the
ownership of the Expos to Major League Baseball.

120.    As set forth in Paragraphs 49, 54, 56, 60, 68-70, 72, and 74-79
above, the MLB Commissioner Defendants and/or their representatives knowingly and
fraudulently made numerous false statements to plaintiffs and/or their representatives,
and knowingly and fraudulently concealed numerous material facts from plaintiffs and
their representatives, concerning various events related to the Montreal Expos and
plaintiffs' ownership interests therein, including but not limited to the following:

(a)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their
representatives during the period from at least February 1999
through December 9, 1999, in which they falsely stated that they
supported keeping the Expos in Montreal and the plans eventually
set forth in CIM-18, when in fact they intended to contract the
team;

(b)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

        representatives during the period from December 9, 1999 through

        December 2000, in which they falsely stated that they supported

        and approved keeping the Expos in Montreal;

(c)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

        representatives during the period from May 2000 through

        January 2001, in which they falsely stated that MLB would

        approve Mr. Loria's buyout of the ownership interests of plaintiffs;

(d)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

        representatives during the period from May through December

        2000, in which they intentionally misrepresented and concealed the

        material fact that Mr. Loria was advising the MLB Commissioner

        Defendants that his buyout of plaintiffs was conditioned upon

        MLB approving a relocation of the Expos to the United States;

(e)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

        representatives during February and March of 2001 in which these

        persons fraudulently stated that Major League Baseball would

        endeavor to purchase plaintiffs' ownership interests in the Expos;

(f)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

        representatives during 2001 in which they intentionally

        misrepresented and concealed the material fact that Major League

        Baseball would acquire and then contract the Expos franchise in

exchange for providing Mr. Loria with ownership of another MLB franchise in the United States; and

(g)   representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during 2001 in which they intentionally misrepresented and concealed material facts concerning the terms under which Mr. Loria would be paid off by the MLB Commissioner Defendants in exchange for transferring the ownership of the Expos to Major League Baseball.

121.   Defendants made such false statements and omissions without legal justification or excuse, with malice, ill will and/or with the intent to purposely defraud plaintiffs.

122.   Plaintiffs justifiably relied upon, and were deceived by, the fraudulent statements by, and material omissions of, defendants.

123.   Plaintiffs have been injured as a result of the fraudulent statements by, and material omissions of, defendants, as described above in Paragraph 108.

## COUNT IV

### Breach of Fiduciary Duty
### (against defendants Selig, DuPuy and the OCB)

124.   Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

125.   Defendants Allan "Bud" Selig, Robert DuPuy and the OCB, by virtue of their positions in Major League Baseball and the responsibilities they hold in

those positions, at all relevant times owed a fiduciary duty to plaintiffs, who were and are owners of an MLB member team.

126.   Defendants Allan "Bud" Selig, as the Commissioner of Baseball, Robert DuPuy, as the President and Chief Operating Officer of Major League Baseball, and the OCB, each, individually and collectively, owed a fiduciary duty to the plaintiffs -- owners of one of the franchises in Major League Baseball, the Montreal Expos.  These defendants owed plaintiffs a fiduciary duty because these defendants all held, and still hold, positions of trust, confidence, and responsibility, and are empowered to bind Major League Baseball for general business matters, and these duties must be undertaken by these defendants with a view towards the best interest of, among the other MLB franchise owners, the plaintiffs.

127.   As set forth in Paragraphs  49, 54, 56, 60, 68-70, 72, and 74-79 above, Defendants Allan "Bud" Selig, Robert DuPuy and the OCB repeatedly breached those duties to plaintiffs, including but not limited to through the commission of the following acts:

> (a)   representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from at least February 1999 through December 9, 1999, in which they falsely stated that they supported keeping the Expos in Montreal and the plans eventually set forth in CIM-18, when in fact they intended to contract the team;
>
> (b)   representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from December 9, 1999 through

December 2000, in which they falsely stated that they supported

and approved keeping the Expos in Montreal;

(c)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

representatives during the period from May 2000 through

January 2001, in which they falsely stated that MLB would

approve Mr. Loria's buyout of the ownership interests of plaintiffs;

(d)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

representatives during the period from May through December

2000, in which they intentionally misrepresented and concealed the

material fact that Mr. Loria was advising the MLB Commissioner

Defendants that his buyout of plaintiffs was conditioned upon

MLB approving a relocation of the Expos to the United States;

(e)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

representatives during February and March of 2001 in which these

persons fraudulently stated that Major League Baseball would

endeavor to purchase plaintiffs' ownership interests in the Expos;

(f)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

representatives during 2001 in which they intentionally

misrepresented and concealed the material fact that Major League

Baseball would acquire and then contract the Expos franchise in

exchange for providing Mr. Loria with ownership of another MLB

franchise in the United States; and

(g)   representations by Mr. Selig, Mr. DuPuy, the OCB and/or their

representations during 2001 in which they intentionally

misrepresented and concealed material facts concerning the terms

under which Mr. Loria would be paid off by the MLB

Commissioner Defendants in exchange for transferring the

ownership of the Expos to Major League Baseball.

128.   Defendants Allan "Bud" Selig, Robert DuPuy and the OCB have

engaged in acts that were designed to further their own personal interests in achieving the

elimination of major league baseball in Montreal, as part of an overall contraction

scheme, at the expense of plaintiffs to whom they owed a fiduciary duty.

129.   Plaintiffs have been severely injured as a result of the breaches of

fiduciary duty by Defendants Allan "Bud" Selig, Robert DuPuy and the OCB, as

described above in Paragraph 108.


## COUNT V

### Negligent Misrepresentation
### (against defendants Selig, DuPuy and the OCB)

130.   Plaintiffs incorporate and reallege the preceding paragraphs as if

fully set out herein.

131.   Defendants Allan "Bud" Selig, Robert DuPuy and the OCB, by

virtue of their positions in Major League Baseball and the responsibilities they hold in

those positions, at all relevant times owed a fiduciary duty to plaintiffs, who were and are

owners of an MLB member team.

132.    Defendants Allan "Bud" Selig, Robert DuPuy and the OCB stood in a special relationship of trust, confidence and responsibility in their obligation to plaintiffs, such that plaintiffs' reliance on the representations of these persons was justified.

133.    As set forth in Paragraphs  49, 54, 56, 60, 68-70, 72, and 74-79 above, Defendants Allan "Bud" Selig, Robert DuPuy and the OCB failed to speak with care in making representations and omissions of material facts, which those defendants intended plaintiffs would rely upon, including the following:

> (a)    representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from at least February 1999 through December 9, 1999, in which they falsely stated that they supported keeping the Expos in Montreal and the plans eventually set forth in CIM-18, when in fact they intended to contract the team;

> (b)    representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from December 9, 1999 through December 2000, in which they falsely stated that they supported and approved keeping the Expos in Montreal;

> (c)    representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from May 2000 through January 2001, in which they falsely stated that MLB would approve Mr. Loria's buyout of the ownership interests of plaintiffs;

(d)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during the period from May through December 2000, in which they misrepresented and concealed the material fact that Mr. Loria was advising the MLB Commissioner Defendants that his buyout of plaintiffs was conditioned upon MLB approving a relocation of the Expos to the United States;

(e)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during February and March of 2001 in which these persons fraudulently stated that Major League Baseball would endeavor to purchase plaintiffs' ownership interests in the Expos;

(f)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during 2001 in which they misrepresented and concealed the material fact that Major League Baseball would acquire and then contract the Expos franchise in exchange for providing Mr. Loria with ownership of another MLB franchise in the United States; and

(g)     representations by Mr. Selig, Mr. DuPuy, the OCB and/or their representatives during 2001 in which they misrepresented and concealed material facts concerning the terms under which Mr. Loria would be paid off by the MLB Commissioner Defendants in exchange for transferring the ownership of the Expos to Major League Baseball.

134.     Plaintiffs reasonably relied upon the negligent representations and material omissions of the MLB Commissioner Defendants.

135.     Plaintiffs have been severely injured as a result of the negligent representations and material omissions by Defendants Allan "Bud" Selig, Robert DuPuy and the OCB, as described above in Paragraph 108.


## COUNT VI

### Injunctive Relief
### (against all defendants)

136.     Plaintiffs incorporate and reallege the preceding paragraphs as if fully set out herein.

137.     The actions taken by defendants as alleged above and incorporated herein have caused and will continue to cause plaintiffs irreparable and immediate injury, loss, and damages, for which there is no adequate remedy at law.

138.     Plaintiffs have a clear legal right to the relief sought under applicable law, and therefore a likelihood of success on the merits of this action and interest in the subject matter of this lawsuit.

139.     No adequate remedy at law exists that can fully protect plaintiffs from the damages they will suffer if the defendants are permitted to sell, relocate, transfer or contract the Montreal Expos MLB franchise or any ownership interests therein.

140.     To preserve the status quo would not be adverse to the public interest.

141. The balance of the equities favors plaintiffs and is in the public interest.

142. The relief sought by the plaintiffs is necessary to prevent and restrain the ongoing violations of applicable law as described herein.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury as to all issues in this matter.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against defendants as follows:

(a) compensatory damages in an amount to be determined at trial, for defendants' violations of RICO, plus treble damages, attorneys' fees and costs of this action, all provided by statute as a result of defendants' violations of 18 U.S.C. § 1962;

(b) compensatory damages in an amount to be determined at trial, for the frauds committed by the Loria Defendants and Defendants Selig, DuPuy and the OCB;

(c) compensatory damages in an amount to be determined at trial, for the MLB Commissioner Defendants' breaches of fiduciary duty and negligent misrepresentations;

(d) punitive damages in an amount no less than one hundred million U.S. dollars ($100,000,000);

        (e)     a constructive trust in favor of plaintiffs with respect to all property of and ownership interest in the Montreal Expos MLB franchise, pending a determination whether the plaintiffs' ownership interests in the franchise should be restored to the position they had prior to December 9, 1999;

        (f)     injunctive relief prohibiting any sale, relocation, other transfer, or contraction of the Montreal Expos MLB franchise or any ownership interests therein;

        (g)     all costs of this action, including reasonable attorneys' fees; and/or

        (h)     such other and further relief as this Court shall deem just and proper.

Dated: July 16, 2000
       Miami, Florida

                          Respectfully submitted,

                          *Edward Soto*

                          Edward Soto (FBN 265144)
                          edward.soto@weil.com
                          Eric N. Assouline (FBN 106143)
                          eric.assouline@weil.com
                          **WEIL, GOTSHAL & MANGES LLP**
                          701 Brickell Avenue, Suite 2100
                          Miami, Florida 33131
                          Telephone:  (305) 577-3100
                          Facsimile:  (305) 374-7159

James W. Quinn
Jeffrey L. Kessler
David G. Feher
Kristyn Noeth
Catherine Piche
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
   *Motions for Admission*
   *Pro Hac Vice to be filed*

JS 44
(Rev 07/89)

CIVIL COVER SHEET  **02-22061**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CIV-UNGARO-BENAGES**

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MO NESBITT BURNS, INC., BCE, INC., CASCADES, INC. ESARBEE INVESTMENTS LIMITED, FAIRMONT HOTEL & RESORTS, INC., FEDERATION DES CAISSES, DESJARDINS DU QUEBEC, et al. | JEFFREY H. LORIA, DAVID SAMSON, ALLAN "BUD" SELIG, OFFICE OF THE COMMISSIONER OF BASEBALL, ROBERT DUPUY, BASEBALL EXPOS GP, INC. and BASEBALL EXPOS L.P. |

**MAGISTRATE JUDGE BROWN**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Montreal,
    (EXCEPT IN U.S. PLAINTIFF CASES)  Canada

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE. IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Edward Soto, Esq./Eric N. Assouline, Esq.
WEIL, GOTSHAL & MANGES LLP
701 Brickell Avenue, Suite 2100
Miami, Florida  33131
305-577-3100

ATTORNEYS (IF KNOWN)

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

18 U.S.C. § 1961 et seq. and Florida common law fraud, breach of fiduciary duty, negligent misrepresentation, and for injunction.

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN** (PLACE AN x IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $ $100,000,000.00 +     CHECK YES only if demanded in complaint   JURY DEMAND: ☒ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):  None

JUDGE _____   DOCKET NUMBER _____

DATE  July 16, 2002    SIGNATURE OF ATTORNEY OF RECORD  _____    $150.00    $150.00  7/16/02